## THE FLYING BY.
## THE EMPIRE.

District Court, D. New Jersey.
Nov. 3, 1933.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine, of New York City, of counsel), for libelant.

Albert G. Goetz, of Detroit, Mich., and Charles S. Pryor, of New York City, for respondent.

CLARK, District Judge.

Most citizens of New Jersey are familiar with the Raritan Canal link in the Atlantic Coast waterway system. This canal connects the Delaware river at Bordentown with the Raritan river and bay at New Brunswick. The canal was opened on June 27, 1834. It was once an important part of the canal system of the state and nation. Nowadays it seems to be chiefly used as an excuse for securing river and harbor appropriations and as a pathway for the numerous small boats whose owners winter in Florida. One such boat sub nomine, Flying By, came to grief on the return trip, June 2, 1931, of its annual hegira. The Flying By was a 44-foot, twin screw cabin cruiser with an 11-foot beam and with a draft of 3 feet 4 inches. The grief aforementioned was a collision with a rock or rocks in the Raritan river about 1,600 feet east (towards New York) of the outlet lock whereby boats are lowered or raised (as the case may be) between the canal and the river. At the time of the collision the Flying By was being piloted by Capt. Mills, a navigator who had been in the habit of bringing boats from Florida by this route. He testified that this was his twentieth trip (the fifth in the Flying By). As insurance against loneliness, he had with him as a passenger (we assume with the consent of the owner and present libelant, Woodworth) the lady who, he testified, has now become his wife and whose absence from the trial is, he says, due to an interesting and commendable event in his family.

Libelant does not attribute the unfortunate happening to the Flying By to inevitable accident or to his agent's negligence, but rather ascribes it to the failure of the respondent, the dredge Empire, to use due care under the circumstances. This dredge was spending part of some government appropriation on widening the channel in the Raritan river just north of the New Brunswick lock. It was anchored in the northern half of the existing 100-foot channel with a clearance of 65 feet between the scow lashed to its starboard side and the south or starboard bank of the river. The depth of the channel ranged from 9 to 11 feet and the depth of the river outside of the channel from 2 to 3 feet. It is admitted that the rock or rocks with which the Flying By collided came into the shallow or nonchannel part of the river through the operations of the dredge Empire.

Capt. Mills' version of the accident is substantially as follows: He was at the wheel of the Flying By as she left the lock. He was proceeding on the starboard side of the channel. He saw the dredge, but, because of the curve of the river, was of the opinion that she and her scow were very close to the right bank. Apparently because of that opinion, he determined to pass the dredge on the port side. To that end he blew two blasts or toots on the klaxon of the Flying By (concededly the correct passing signal for an overtaking boat intending to pass with the dredge on its starboard). The dredge gave no signals of any kind, either answering or alarm. Continuing, however, with intention indicated by them, Capt. Mills changed his course to the port and shallow side of the river, and passed the Empire on that side. In doing so, he ran into a submerged rock or rocks just beyond the dredge, and was wrecked. He did not see the arrows on the Empire. He attributed this to the swinging to and fro of her bucket boom.

The only other witnesses called by the libelant were a wrecker, employed by the libelant, and the lock tender. The former claimed that the arrows on the dredge were hard to distinguish because of the boom and because it was not sufficiently above the dredge's deck house. He admitted on cross-examination that the time between swings of the allegedly obscuring boom was very short. The lock tender said that after, but not before, the accident he received orders from the United States engineer to warn eastbound boats to pass to the right of the dredge. This testimony would seem subject to the vice of "subsequent repair" evidence, and to be therefore of doubtful cogency. The lock tender also told of the safe passage to the starboard of the dredge of a large houseboat which immediately followed the Flying By. The libelant called the United States chief inspector, who was on the Empire on June 2d, who testified as to the exact position of the dredge from charts made at the time and as to the arrows.

The respondent offered two eyewitnesses, the dredge superintendent and the man who operated its launch (no longer employed by the respondent company). The former was on the shore close to the dredge, and the latter was standing at the outlet lock. Their account of the circumstances leading up to the

accident agrees, and is diametrically opposed to that of Capt. Mills. They both say that he was not at the wheel at all when the Flying By left the lock, and only returned thereto when the boat was about 300 feet from the Empire. The launch operator said that only the port motor of the Flying By was running, and that the captain's absence was due to his going down into the motor compartment. Both witnesses agree with Mills that the Flying By was proceeding on the starboard side of the channel for some time after leaving the lock. They say that upon his resuming the wheel she swerved sharply from this course and crossed the channel to pass the Empire on the port side. Neither eye nor ear witness heard any whistle from the Flying By.

It is the court's opinion that the story told by Capt. Mills represents what he now believes happened rather than anything that actually transpired. In saying this, the court does not wish to be understood as accusing the witness of conscious falsehood. If that were the court's belief, grand jury action would have to be in order. In this vale of tears it is impossible to eradicate the numbing influence of self-interest. Combine that with our ordinary feeble powers of observation (see Munsterberg, "On the Witness Stand"), and it results in a story which coincides with the witness' interest rather than with his actual observation. He tells what he would like to have had happen rather than the actual occurrence.

The court realizes that the two witnesses for the respondent, the dredge superintendent and the launch operator, may also be said to have an interest averse to accurate recollection. The latter's motive for such blindness to the truth would seem to be rather faint, he being no longer in the service of the respondent, Dunbar & Sullivan Dredging Company. We are therefore going to attempt the touchstone of inherent probability. Such a test leaves no doubt in the court's mind.

The undisputed fact was that there were 65 feet of clear channel between the dredge's scow and the starboard or south banks of the Raritan river. The undisputed fact was also that Capt. Mills knew that the depth of the river in this channel was from 9 to 11 feet, and that the depth of the river outside of this channel was from 3 to 4 feet, barely more than the draft of the Flying By. The captain explains his choice of a course by the statement that the "shape of the river had prevented his seeing the open water to the starboard of the Empire." This, of course, would be so only if there was a pronounced bend or rather bulge in the river at the point where the dredge was anchored. It is not necessary to figure elaborately any angles of incidence in order to refute this assertion. One glance at the map (Exhibit 4, libelant's) indicates plainly such a gradual curve that no angle of vision would shrink the proportion of open water.

The motive assigned for Capt. Mills' surrendering the helm to his fair passenger was engine trouble. By his own admission his starboard engine started only because of the pull (encouragement) of its twin engine. He further admitted that it was slow in starting on this particular occasion. According to his story, he showed no curiosity or interest in the recalcitrant engine, and wants us to believe that the industrious example of its companion was sufficient. It seems unlikely.

Capt. Mills would have us believe that he kept to the starboard side of the channel until he had nearly reached the dredge, although he had already made up his mind and his whistles to pass on the opposite side. In other words, his action was sudden and his intention deliberate. Most people suit their actions to their thoughts (as well as to their words). We think Capt. Mills is no exception.

In the light of this, we hope, reasonably critical analysis, Capt. Mills' story has three weak points which are inconsistent with the undisputed facts. If he had been at the wheel and looking where he was going, he would have seen plenty of open water to pass in a channel whose depth he knew to be beyond doubt adequate. There was something wrong with one of his engines. There was only controversy about the extent of the disability and what he did about it. Because there is little advantage in a hypocritical thought, our actions do not usually have an abruptly different appearance. Why should Capt. Mills remain on one side of the channel if he had made up his mind to pass the dredge on the other? In short, the eyewitnesses of the accident can be reconciled with Capt. Mills' admissions. His own story depends solely upon his own veracity.

Libelant will agree that, if Capt. Mills, for one reason or another, has given us an incorrect picture of the occurrences of June 2d, he has no case. It may be, however, that some other court will feel that his story rings truer than our own analysis of it. In that event, it becomes necessary to consider a legal

situation. The facts as then assumed indicate, it is asserted, a breach of duty on the part of the Empire in two particulars. The duty, if any, is statutory, and the statute is for the benefit of the class injured. We have only to ascertain, therefore, whether the violation contributed to the injury. To answer this question requires a somewhat detailed examination of the pertinent provisions of the United States Code.

The physical laws of space make it quite apparent that restriction of area without anticipation of use spells disaster. This is true whether the area be earth, air (fire), or water. So it is that the regulation of traffic on the highways, the waterways, and now in the air [title 49 USCA § 176 (a); Neiswonger v. Goodyear Tire & Rubber Co. (D. C.) 35 F.(2d) page 761, information bulletin No. 7, Department of Commerce] has been undertaken by the government. As is not unusual with us, there exists both confusion in the legislation itself and in the designation of the particular agency (department) through which the sovereign acts.

We find Congress sometimes enacting their own rules (33 USCA §§ 302, 311 et seq.); sometimes adopting international regulations by statute, Act of March 3, 1885, 23 Stat. c. 354, page 438 (afterwards superseded by various legislation and finally compiled and enacted as title 33 USCA § 61 et seq.), and sometimes intrusting the formulation of rules to various departments in the government. As might be supposed, such procedure leads both to a nonuniformity not justified by conditions and to conflict of authority between the departments. We have an excellent illustration of this in the principal case. By section 2 of the Act of 1897, 30 Stat. 102, as amended by the Act of May 25, 1914, 38 Stat. 381, title 33 USCA § 157, it is made the duty of the supervising inspectors to establish rules "to be observed by steam vessels in passing each other and as to the lights to be carried by ferryboats and by barges and canal boats when in tow of steam vessels, and as to the lights and day signals to be carried by vessels, dredges of all types."

On the other hand, the second amendment to section 4, Act of August 18, 1894, 28 Stat. 362, title 33 USCA § 1, pp. 15, 16, makes an assignment to the Secretary of War in terms as follows: "It shall be the duty of the Secretary of War to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department."

This inclusive language (cf., "navigable waters of the United States" and "protection of life and property") makes it apparent that regulations thereunder must be compared with all other delegations to ascertain whether or not the limitation contained in the last sentence is or is not applicable. It seems to us rather doubtful if Congress intended this result. Legislation prior to the amendment of 1917 related to the protection of United States property; i. e., canals, etc., and the protection of the War Department as an agency for the improvement of such property. It would be our guess that the general terms above referred to were added for good luck. It seems curious, otherwise, that a different and rather unsuited department of the government should be given the duties for many years belonging to the Department of Commerce. Thus the latter department has had a vessel inspection service and appropriately has concerned itself with the prevention of accidents on the high seas and on inland waters. The War Department, on the other hand, through its engineer service, has had charge of that part of navigation which relates to the improvement of the medium thereof rather than with the improvement of the conduct of those who take advantage of that medium.

A practical illustration of this confusion is found in the contention of the libelant with respect to the wooden arrow. This arrow is required by public notice No. 25, published April 9, 1931, by the War Department, the pertinent part of which reads as follows: "Wooden arrows will be placed on the different pieces of plant engaged on this work to indicate to navigators the course to be followed in passing them."

This action of the War Department is nugatory. Title 33 USCA § 157, above quoted, states that the supervising inspectors shall establish rules for day signals to be carried by dredges. As the wooden arrow is plainly such a signal, the regulation, if given, should have been issued by the Department of Commerce and not by the War Department. Counsel for both sides at the trial seemed to assume that the "wooden arrow provision" was properly promulgated. We suggest that a more careful examination of the rather intricate laws concerned would have led them to

a different conclusion. The only effect that can be given to the "wooden arrow provision" is that it is a wise precaution "in the opinion of a Department having in its service men of technical training familiar with the conditions." The Michael Tracy (C. C. A.) 43 F. (2d) 965, at page 966.

Considered in that light, we think that the arrow erected on the dredge fulfills all requirements of reasonable care. It is not, and scarcely can be, contended that the warning arrow is not large enough to be fairly visible. The complaint is rather directed towards its position. It is difficult to see in exactly what position the arrow could have been placed. From the photographs (Libelant's Exhibits 2 and 3 and Respondent's 3 and 4), it appears that the arrow is affixed to the port upright about 10 feet above the superstructure and extends for its entire length over the water. There can be no question, therefore, but that an arrow of such construction and so placed would be clearly visible for many times the distance from the lock to the dredge. It is urged, however, that this condition is only spasmodic, because of the operation of the boom apparatus for lowering and operating the dredge bucket or scoop. It is a fact that this rotating apparatus does in certain positions obscure the arrow as far as those approaching from the north side of the dredge are concerned. The complete answer to that argument lies in the fact that the same situation is applicable to any place on the dredge in which the arrow could have been placed. In other words, this large boom in the course of its functioning swings from one side of the dredge to the other, and ultimately comes between every part thereof and the outside world. It might be stated in passing that the swinging operation occupies a period of from 25 seconds to a minute, and it seems difficult to believe that the obscuring on the day of the accident was of anything but momentary duration. However that may be, it is conceded that Capt. Mills was thoroughly familiar with the operation of dredges and with the fact that arrows indicating the proper side to pass are customarily displayed at the request of the government engineers. It would seem to be clear, therefore, that, if parts of the dredge were obscured by its boom, it would be his duty to wait until such parts were clear and the presence or absence of arrows thereon be ascertained. Otherwise, of course, it would be impossible to operate dredges without having movable arrows and the means for moving them. We conclude, therefore, that there was no negligence on the part of the dredge in so far as the arrow is concerned, and further the fault, if any, was by Capt. Mills in not making certain of its position.

The libelant insists that the Flying By was entitled to rely upon the failure of the dredge to perform its duty to sound the alarm signal in answer to its starboard to starboard passing signal. This theory assumes that the failure contributed to the injury. This contention is somewhat astonishing in view both of the exigencies of navigation and the conforming state of the authorities. We agree that the Regulations of the War Department of May 19, 1928 (Supplemental Regulations of the War Department), pages 3 to 5, were promulgated under proper statutory authority. The supervising inspectors, for some strange reason, are given no supervision of the passing of vessels and dredges. This is the more curious, as we have just seen that they are given supervision over the light and day signals to be carried by such dredges. In other words, they are supposed to be wise as to visible, but not vocal, signals.

We have another instance of legislative and administrative confusion in the varied terminology of the rules governing passing signals. In the International Rules and Great Lakes Rules, the passing course of both end on and overtaking vessels is definitely prescribed (title 33 USCA §§ 103, 109 [articles 18 and 24]; sections 282, 287), and the sound signals section (sections 113, 288) gives the meaning of the blasts. The Great Lakes Rules provide for a dissent (section 291). The Inland Rules, on the other hand, in addition to a prescribed course, permit of a choice for overtaking vessels and for an alarm signal upon dissent (title 33 USCA § 203, rules 1, 3, and 8 of Pilot rules, art. 18). The special floating plant rule applicable in the principal case also contains the alarm signal clause.

The exact wording of these various rules is material in only one particular. All, except the Great Lakes regulation, are phrased in the conditional form. So the Inland Rules say:

"Which the other vessel shall answer promptly by a similar blast of her whistle, and *thereupon* such vessels shall pass on the port side of each other." (Article 18, rule 1.)

"And *if* the vessel ahead answers with two blasts, shall put her helm to starboard" (article 18, rule 8);

—and in the rule of the principal case: "Which shall be answered in the usual man-

ner if the channel is clear and the approaching vessel may pass on the course indicated." (Section 2, War Department Regulations, May 1928, page 4.)

These conditions cannot be overridden except by express language. We do not find any such explicit meaning in the alarm signal provisions. They simply state a duty on the part of one vessel, but do not attempt to relieve the other of its obligation to proceed only upon the fulfillment of the condition. In other words, the obligations imposed are reciprocal, both vessels playing at the same game. This, of course, effectually disposes of libelant's contention that he was entitled to proceed without an answering signal and simply because of the failure of the dredge to sound the alarm. The negligence of the dredge in not so sounding an alarm did not, therefore, contribute to the accident. On the contrary, it was due to the Flying By's proceeding in the absence of an answering signal.

The United States Supreme Court in the case of The New York, 175 U. S. page 187, at pages 201, 202, 20 S. Ct. 67, 72, 44 L. Ed. 126, said: "The Conemaugh had construed her failure to reply as an acquiescence in her own signals. The New York might have construed such failure as a refusal to acquiesce. In such a case it was clearly incumbent upon the Conemaugh to stop until the *mystery of her silence* was explained, and in failing so to do she was guilty of fault."

A galaxy of similar authority is to be found in title 33 USCA, listed under the appropriate sections and notes. So under "vessels meeting end on," section 203, note 74; "overtaking vessels," section 203, notes 146 and 149; Navigation of the Great Lakes, section 291, note 7. It will be noticed that the authorities here are even more persuasive. This because the particular rule in the Great Lakes Rules is not in the conditional form which we have noted above (The City of Erie (D. C.) 250 F. page 259). The rule of law announced in these cases is manifestly a sensible one. There may be situations in which standing mute imputes acceptance and silence gives assent. The always hazardous maneuvering of vessels is not one of them. There must be no uncertainty or misunderstanding. A meeting of the minds is as essential to safety on the water as to agreement in the law of contracts.

The libel will be dismissed.