### THE B. M. THOMAS.

### THE LIGHTER NO. 146.

### THE SCANPENN.

### Nos. 13829, 13965.

District Court, E. D. New York.

March 8, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for American Scantic Line, Inc., and the Scanpenn.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for Warner Co. and the B. M. Thomas.

GALSTON, District Judge.

These are cross-libels, and on stipulation were tried together on the same proofs.

At about 2:30 p. m. on October 22, 1932, the steamer Scanpenn sailed from pier 53 south, Philadelphia, bound for New York, and proceeded down the Delaware river. The weather conditions were good, clear, with

746

a gentle breeze, the tide ebb. Starting down the river, the Scanpenn was about three or four hundred feet off the Pennsylvania shore.

The tug B. S. Thomas, approaching from the opposite direction, was observed about three-quarters of a mile away. At that time she was a little on the Scanpenn's starboard bow, and also was about three or four hundred feet from the Pennsylvania piers.

The vessels were half a mile apart, and on curving courses, when the Scanpenn sounded a one-whistle blast and changed her course a little to starboard. There was no response to this signal, but, on the contrary, the tug with her scow in tow was observed to alter its course toward the .Pennsylvania shore.· Thereupon a second one-whistle blast was given, and the Scanpenn eased to starboard. To the second one-blast signal the tug responded with a one-blast signal and veered toward the Jersey shore.

A dredge was stationed in the river, about 150 feet off pier 98 south, ahead of the Scanpenn. To the south of the dredge were dredging stakes, and the steamer in passing came within 10 or 15 feet of those stakes. Though orders were given to the steamer to go full speed astern, that order was not effected, for when collision was seen to be inevitable, a full speed ahead order was given, at which time the tug was heading across stream towards the Jersey shore, while the scow in her tow came head-on towards the Scanpenn. The tug cleared the steamer, but in her swing brought the port forward corner of the scow into collision with the port side of the Scanpenn, about 15 or 20 feet off the stakes and just south of pier 98 and about 300 feet off the pier.

There are some facts which stand out undisputed, the most important of which is the position of the tug Thomas' on the Pennsylvania side of the river when first sighted by the Scanpenn. She sought to justify her position by the direction of the wind, and by virtue of a custom in navigating up the Delaware river. It may be said that there is no proof of such custom. Indeed, the captain of the Thomas testified:

"Q. Well, is that a custom prevailing, as you say, between tows that meet there in the river? A. No, it isn't no custom. No, it is just according to whom you meet, whether you want to use your own judgment, and one man will give in and another man will not. One man will give way to you and another man won't. That is all that is; it is not a custom at all."

The second undisputed fact is that there was no answering signal given by the Thomas to the first blast whistle of the Scanpenn.

Thirdly, the Thomas, though she sought a starboard to starboard passing, gave no signal to effect such objective.

The main point in disagreement is the course pursued by the Scanpenn. Those on board the Scanpenn agree in positioning her at all times nearer the Pennsylvania shore and on her own starboard side of the channel; on the other hand, the Warner Company insists that the Scanpenn was on the New Jersey side of the river. This presents the real issue in the case, for if the Scanpenn on sighting the Thomas was on the Pennsylvania side, then there was presented a head to head situation. If, on the other hand, the Scanpenn was in the position as stated by the captain of the Thomas, then it is possible that a starboard to starboard passing, even without an exchange of signals, could have been effected.

The Thomas makes much of the plotting on the chart (libelant's Exhibit 4) by the master of the Scanpenn, of the courses recorded on the Scanpenn's automatic recorder. From this chart it is argued that it was impossible for the Scanpenn to have been in the positions stated by the master, as she proceeded down the Delaware river and at the time that she sighted the Thomas and her tow. But whether the Scanpenn was 553 feet or 800 feet off the Pennsylvania shore, and the Warner Company contends she must have been at the least the former distance off and more likely the latter, the Scanpenn was, nevertheless, on her own side of the river before she changed her course to starboard, for the river at that point is 1,800 feet in width.

█ Kelly, the captain of the Thomas, is hardly in disagreement, for from his marking of the chart, Exhibit B, the Scanpenn's positions S1, S2, and S3 were nearer the Pennsylvania side of the river. I must conclude, therefore, that the Scanpenn, from the time that she first moved to starboard to the time of the collision, favored the Pennsylvania shore and traveled on her own side of the channel. I can find nothing in the record which warrants the conclusion that the navigation of the Scanpenn was faulty. She complied with proper navigation by porting her helm after giving a first one-blast signal and directing her course to starboard towards Pennsylvania. So much seems really to have been admitted by Kelly:

"Q. At the time he blew the second whistle, or before he blew the second whistle, or

immediately after he blew the second whistle, did he make any change in course? A. Yes; when he blew the first whistle he started to come around a little bit gradually, and when he gave me the second whistle he come right straight hard over, and then down the river, clearing a dredging machine there. ⁙ ⁖ ⁂ ”

"Q. So that when she sounded her first one-blast signal, she began to change to starboard about the time that she sounded her first one-blast signal, is that right? A. Yes, sir, right shortly after that."

As contrasted with this proper maneuvering of the Scanpenn, there is the wholly improper course of the Thomas in suddenly shifting her position to port after first holding straight on. Had she continued in that position, in all likelihood the Scanpenn's maneuver might have resulted in a safe port to port passing without help from the Thomas. With the river at the point of collision some 1,800 feet wide, had the Thomas not been guilty of faulty maneuvering, there could not have been a collision 320 feet off the Pennsylvania piers.

Article 18, rule 1 of the Inland Rules (33 USCA § 203, Rule 1), relates to a situation of this kind. The rule provides:

"When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

Kelly's marking of the chart certainly does not warrant the conclusion that he was justified in expecting a starboard to starboard passing.

Since a head to head approach was indicated, the Thomas by compulsion of the statute was required to give an answering signal. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126. Her failure to do so puts her at fault and adds to her original fault in being on the wrong side of the channel. The Bilbster (C. C. A.) 6 F.(2d) 954.

Then, too, the Thomas' veer to port, to the position indicated by her captain, B. M. T. 2 on respondent's Exhibit B, following the first port to port signal from the Scanpenn, was a grave fault. The captain of the Thomas must have known that the Scanpenn's signal was intended for him, since he admitted that there was no other vessel in sight from which the signal could have emanated. Hence his first change of course to port was wholly unjustified.

Again, having reached the position B. M. T. 2, it was flying in the face of article 18, rule 1, to fail to give a starboard to starboard signal; and she was not entitled to such passing without the assent of the other vessel. Article 18, rule 1, of the Inland Rules, and authorities to the same effect. The Sabine Sun (C. C. A.) 33 F.(2d) 42; The Dauntless (C. C. A.) 3 F.(2d) 529. Her final maneuver to her own starboard made the collision inevitable.

Finally, it may be noted that the failure of the Thomas to keep to her own starboard side of the channel was a violation of article 25 of the Inland Rules (33 USCA § 210), which provides:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

In the absence of any custom to the contrary, the Thomas was bound by this rule. Lehigh Coal & Navigation Co. v. Compagnie Générale Transatlantique (C. C. A.) 12 F.(2d) 337; Marshall Field & Co. v. United States (C. C. A.) 48 F.(2d) 763.

The American Scantic Line, Inc., may have a decree; and the cross-libel of the tug B. M. Thomas is dismissed.

Settle decree on notice.