### THE R. G. TOWNSEND.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

No. 106.

1. Collision &⇒95(1)—Scow owner assumed risk of ice, but not of collision, due to insufficient power of tug.

A scow owner assumed all risk of damage to the scow produced by ice, by consenting that she be towed with the iced condition of the water; but he did not assume risks of collision with other vessels, due to insufficient power of the tug having charge of the tow.

2. Collision &⇒95(2)—Steam tug held at fault in endeavoring to navigate without assisting tug.

The steam tug R. G. Townsend was at fault in endeavoring to navigate New York Harbor during an ice floe with 11 scows in tow, without an assisting tug, and was liable for the collision of a scow with a vessel in the harbor.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by Donald J. Sargent against the steam tug R. G. Townsend, her engines, etc.; the Cornell Steamboat Company, claimant. Decree for claimant, and libelant appeals. Reversed.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for appellant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for appellee.

&⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The appellant is the managing owner of the scow Willis G. Townes. The appellee owned the steam tug R. G. Townsend, which is 80 feet long, 8 feet 5 inches in depth, and 40 years old. On the 23d of January, 1918, the R. G. Townsend left Edgewater about 9:30 o'clock p. m., having 11 scows in tow, loaded with coal bound for Newton Creek. The scows were made up in tiers, three abreast. The Townes was the starboard hawser scow. The winter of 1917–1918 was one of the coldest experienced in and about the harbor and river of New York, and the ice floe was very heavy. At the time in question the river was filled with ice, and in navigating the tow went down the Hudson river on the ebb tide. The Townsend endeavored to navigate the flotilla without assistance. When she reached about opposite Fifty-Fourth street, Manhattan, she became wedged in the ice and drifted down with the tide. Then the flotilla became unmanageable and the bow of the Townes came in collision with a steamship anchored off the Delaware & Hudson piers at Weehawken. Before the collision, the flotilla had drifted about a mile. After the collision, the Townsend drifted down on the New York side of the anchored steamship and her tow went down on the Jersey side. Thereafter three steam tugs belonging to the appellee came to the assistance of the Townsend and her tow. The Townes was taken in tow by one of the tugs, and while upon a course toward the Jersey flats sank off the pier of the Central Railroad of New Jersey. The weather was clear for seeing lights, and the steamship lights were observed by those in charge of the Townsend, as well as the master of the scow Townes.

[1] Fault is charged against the steam tug, because she had insufficient power to safely handle the boats she had in tow; also because, under the circumstances, she attempted the navigation alone. The scow owner was desirous of making delivery of the coal, and undoubtedly assumed all risks of damage to the scow produced by the ice in his permission and consent that she be towed with the ice condition of the waters; but he did not assume risks of collision with other vessels, due to the insufficient power of the steam tug having charge of the tow. Those in charge of the Townsend had full knowledge of the condition of the ice, and should have had regard of the number of boats which she attempted to tow. The manager of the steamboat company acknowledged that he knew the ice conditions as they prevailed when the left Edgewater on the night in question, and that there was never experienced an ice floe heavier in New York harbor than at this time. Still he permitted the Townsend to go out without a helper. He also testified that the Townsend had 14 boats in tow from Edgewater, and that it was the custom of the tug to go down the North River with the ebb tide, and go into the East River with the first of the flood tide. The Townsend could make no headway with her tow against the tide, and she towed with the tide always. The manager says the Townsend could not tow against the tide with 2 of these boats. It is plain that the master of the Townsend had full knowledge of the ice and tide conditions.

[2] We think the steam tug was at fault in endeavoring to navigate, without an assisting tug, this large flotilla of scows in view of the ice condition of the river. While the Townsend may have undertaken this work on former occasions with safety, the danger arising from heavy ice was too apparent this time. It was always present. Those in charge knew that she did not have sufficient power to take her tow through the ice. They were content to proceed down the river with the tide. While ordinarily the duty of a helping tug may be to take boats out of the tow, in these unusual conditions the contract for towing had implied therein the requirement of doing more than drifting with the tide. These conditions of ice were what ought to have been expected by a prudent navigator, in view of the weather. The master was charged with the knowledge of the tide and its set, and, if he was caught in heavy ice, the tug in tow must go whither the tide set. It was ebb tide that brought about the collision. The Townsend first met conditions involving extreme peril, and went out into the heavy ice, and then found itself unable to change the direction of her tow, and was carried by the ebb tide into collision with the steamship. The owner of the scow did not assume the risk of such navigation. It was not implied in the contract of towing. The collision was due to faulty navigation and a breach of the employment for towing.

We think the libelant should have a decree.

Decree reversed.