## THE J. R. BALDWIN et al.

## THE W. N. BAVIER.

## THE CORNELL 21.

### No. 13727.

District Court, E. D. New York.
March 17, 1934.

Macklin, Brown, Lenahan & Speer and Carl F. Vander Clute, all of New York City, for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann and Robert S. Erskine, all of New York City, for claimant.

CAMPBELL, District Judge.

The libelant seeks in this suit to recover for the barge Baldwin and her cargo of hay as a total loss, from the steamtugs Bavier and Cornell 21, because of their alleged negligence in towing the barge Baldwin, in the Hudson river, through ice.

In the month of December, 1932, the libelant was the owner, and her husband, Stephen P. Miller, was the captain of the barge J. R. Baldwin, which was loaded with a cargo of hay at Castleton and Coxsackie, about two weeks being consumed in the loading.

The captain had charge of the operation of the boat.

On Tuesday, December 13, 1932, Capt. Miller, of the barge J. R. Baldwin, called up the Waterford office of the Cornell Steamboat Company, and after asking them if it would be safe for Thursday, and receiving the reply "sure," made arrangements to be towed on Thursday.

On Thursday, December 15, 1932, the tug W. N. Bavier left Albany with two light boats, a stick lighter and a manure scow in tow. At about 9:30 p. m. on that day, the assisting tug Cornell 21 picked up the Baldwin, at Coxsackie, and placed her in the tow of the Bavier as the starboard boat of the head tier. The Bavier had the tow on two short hawsers, one from the port bow corner of the stick lighter to the stern of the Bavier, the other from the middle bow bitt of the Baldwin. About thirty minutes after the Baldwin was placed in the tow, the Cornell 21 placed the loaded brick scow Empire 15 in the tow, under the stern of the Baldwin. The Empire 15 was placed in the tow off Pine Grove, which is on the west side of the Hudson river, about midway between Coxsackie and Athens. The captain of the Baldwin and his assistant Finkel were clearly wrong when they fixed the time of the placing of the brick scow Empire 15 in the tow as about 9 o'clock the next morning.

At the time the Baldwin was placed in the tow there was no ice in the river at Coxsackie.

After the Empire 15 was placed in the tow, the Bavier proceeded down the river with her tow on hawsers, the two light scows in tow on the port side and two loaded scows in tow on the starboard side, the Baldwin being the starboard hawser boat. When not engaged in taking out of, or putting boats in the tow, the Cornell 21 pulled alongside of the port side of the Bavier, and the Bavier

slackening her port hawser brought the Bavier ahead of the Baldwin, and the Cornell 21 ahead of the stick lighter. When the Cornell 21 was not pulling alongside the Bavier, the Bavier with her hawsers even was ahead of both of the hawser boats, her stern being in the center of the two boats.

The next morning, December 16, 1932, after daylight, when above Kingston, the tug with her tow encountered broken ice that had formed that night in bunches, as is the custom with the first ice that freezes, as the tide will carry it, and it is formed together by the tide.

The captain of the Bavier saw nothing in the ice condition at that time that caused him to believe there was danger in continuing down as they were going.

One of the light boats on the port side was taken out at Kingston and another light boat was put in the tow on the port side, thus leaving the tow as it was before, two loaded boats on the starboard side and two light boats on the port side.

When between Poughkeepsie and the Meadows Light, the witness Finkel, who was employed on the Baldwin, went forward and sounded her and found 11 inches of water in her.

The Baldwin was then in the ice.

He had sounded the Baldwin about a couple of hours before that and found only 3 inches, which would be about the ordinary sounding.

He went into the hold and found a seam, the oakum, and the plank cut.

In order to get at it, he had to cut a hole in the lining. He went aft and fetched an ax, saw, and auger to cut out the ceiling.

Finkel having reported the leak to him, Miller, the captain of the Baldwin, called the tug Bavier, with the result that the No. 21 was sent back alongside the Baldwin.

About 1 o'clock p. m., Master Tucker, Pilot Tucker, Deckhands Hines and Van Wagner, and the cook of the No. 21 went aboard the Baldwin and down in her hold. The master of the No. 21 found a crack right close to the seam, and there were two wedges, each about 10 to 11 inches long by about 3 inches wide, made of wood, which had been driven in. Finkel, of the Baldwin, testified that he drove the wedges in when he discovered the leak.

They did not fill up the crack, so they pulled them out, filed up the crack, where the seam was open, with a lot of old rags and other stuff, and put a board patch on with a

piece of timber across the patch, and drove wedges over that to the ceiling to hold it.

This was better than a brace, as there was no place to put a brace. This practically stopped the leak.

All who worked on the patch and Finkel of the Baldwin, whose captain, Miller, did not go down and look at the patch, thought that the boat was all right, as she could easily take care of the little water she would make, and neither the captain of the Baldwin, nor Finkel, requested that any change be made in the position of the Baldwin in the tow.

When the tow arrived off Poughkeepsie, the No. 21 put a boat in the tow.

While there is a conflict in the evidence, I am convinced that the captain of the Baldwin did not tell the No. 21 that the Baldwin was leaking again, and that it would be better to drop her astern of the other boat; on the contrary, the Baldwin could take care of any water that came in, and was all right.

The tow continued on down the river below Poughkeepsie and the ice disappeared.

Later, Finkel found considerable water in the sounding pipe and went below and discovered that the patch had broken off, and that the water was coming in in the same place.

He sounded her and found about 14 or 15 inches of water, and tried to pump her. He then sounded again and found 18 inches. He then pumped for 10 minutes, and went into the hold and found 2 feet of water.

The gasoline pump was running all the time and the water was gaining on the pumps. Finkel then went aft and packed up his satchel in readiness to go ashore, if it became necessary. The Baldwin then took a list to starboard and the Bavier blew an alarm, blowing 4 or 5 minutes, and rounded up and called the captain of the Bavier, and he jumped on the Baldwin and dropped the brick scow from behind the Baldwin, so that when they got into the dock they could pull the Baldwin out of there.

No signal was given by any one on the Baldwin to the Bavier or the No. 21, when the patch came off, and those on the Bavier and the No. 21 knew nothing about the patch coming off or the Baldwin making water until the Baldwin took a sudden list.

It was then too late to use a siphon.

The Bavier hung up the rest of her tow at Milton, and took the Baldwin to Marlboro, where she tied the Baldwin up at the Rosoff dock.

The Baldwin had listed and dumped part of her cargo before that time, and when tied up at Marlboro she had listed well over on her side, but some of the hay was not wet, and neither boat nor cargo was a total loss.

In tying up the Baldwin at Marlboro, the Bavier acted in the best interest of the barge, and left her in the best and only place available.

From the time the patch came off, the captain and his helper Finkel, of the Baldwin, in effect did nothing to in any way minimize or prevent further damage and after the barge was landed at Marlboro, they abandoned both boat and cargo.

The place of the break on the Baldwin was about 3 inches below the water line.

The errors in the evidence of the captain and his helper, of the Baldwin, as to the time the brick boat was landed in the tow, the thickness of the ice, and the requests to change the position of the Baldwin in the tow, materially affect the weight of their evidence.

The mere fact that the Baldwin was damaged is not sufficient to render the tug liable, as negligence on the part of the tug must be shown, and the burden rested on the libelant to prove that the damage complained of resulted from the specific acts of negligence alleged. The Bear (D. C.) 11 F.(2d) 607, affirmed without opinion, Clark v. The Bear (C. C. A.) 11 F.(2d) 608.

That the damage was caused by ice is but an inference, as no shock, no grinding sound, and no other indication of ice contacting with the Baldwin is shown.

With the tugs on short hawsers as described, they certainly by their quick water broke a larger lane through the ice than their width.

The place of the cut out seam and plank on the Baldwin was not immediately on the bow but a short distance aft of the round of the bow a place where there would have been the same danger from ice wherever towed.

This was a fleet tow and in sending the Baldwin in such a tow, the owner assumed some risk.

The Baldwin was an old boat 68 or 69 years old, but apparently in good shape and no notice of any weakness of the boat was given to the tugs.

The libelant contends that in the ice the boats should have been singled out, but with the beam of the Bavier 21.5 feet, and the Baldwin 32 feet, it would seem to me that the Baldwin would not have been in a safer position.

The case of Daly v. Pennsylvania R. Co. (D. C.) 257 F. 761, cited by libelant, is not in point, as it involved towage of a fleet through heavy solid ice, the tugs not being side by side.

The following cases cited by libelant, The Bern (C. C. A.) 213 F. 630, The Tug Bear (D. C.) 11 F.(2d) 607, 1925 A. M. C. 443, and The Rambler (D. C.) 66 F. 355, are not in point, as they involve the towage of single boats alongside the tug in heavy ice, or at night, and are thus distinguished.

I can see no reason for criticizing the navigation of the tugs by men of long experience, who thought that the tow was properly made up. The Edwin Terry (C. C. A) 162 F. 309; The Hercules (C. C. A.) 213 F. 615; The R. G. Townsend (C. C. A.) 278 F. 726. .

Those on the Baldwin and the No. 21 thought it safe to continue the Baldwin in the head tier of the tow after the patch was put on, and judged in the light of all that transpired, and the failure of those on the Baldwin to signal the Bavier when the patch came off, it was fortunate that the Baldwin was where the Bavier could see her take the list.

The cases cited by the libelant to support her contention that the Baldwin, after first springing a leak, was entitled to more than ordinary care, are not in point, as there was nothing more the tugs could do, and notwithstanding the absolute lack of diligence and care by those on the Baldwin, it was due solely to the observation and care of those on the Bavier that the Baldwin did not sink but was beached.

In fact all that was done by any one connected with, or owner of the barge Baldwin, after the patch came off, was a little pumping and the taking of a casual glance at her by her captain, from the dock, two days after the Baldwin was left at Marlboro.

The captain of the Baldwin never went below to see the extent of the damage to his boat, and both he and his helper abandoned the barge at Milton.

It seems clear to me that no liability can rest on the tugs for anything that happened after the patch came off, as due diligence on the part of the captain and his helper of the Baldwin required the giving of immediate notice to the tugs which would have given them an opportunity to put a siphon in her and keep her afloat, and certainly the

938

tugs cannot be liable for any damages that happened after the Baldwin was landed at Marlboro, as she was abandoned by her captain and his assistant, who failed to exercise any care over her. The J. G. Rose (C. C. A.) 9 F.(2d) 917.

I conclude that the libelant has failed to show by a fair preponderance of the evidence that the steamtugs W. N. Bavier and Cornell No. 21 were guilty of any negligence, and that they are wholly without fault.

A decree may be entered in favor of the claimant of said steamtugs against the libelant, dismissing the libel with costs.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.