## THE OVERBROOK.

### (District Court, E. D. New York. June 26, 1906.)

COLLISION—TOW AND DREDGE—UNSKILLFUL NAVIGATION.

A tug with a helper, towing 27 canal boats through the Arthur Kill, going eastward with the flood tide, *held* in fault for a collision between boats in the tow and a dredge, with her attendant scow, which were working in the channel; the evidence showing that the tow had 395 feet of clear space, which, with proper navigation, was sufficient to enable it to pass in safety. The dredge *held* not in fault for having the scow on the channel side, which was shown to be the most advantageous for the work.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 68, 87, 88½.]

In Admiralty. Suit for collision.

Carpenter, Park & Symmers (James E. Carpenter, advocate), for libelant.

Robinson, Biddle & Ward (William S. Montgomery and Henry G. Ward, advocates), for claimant.

THOMAS, District Judge. This libel involves the collision of the tow (27 loaded canal boats) in charge of the steam tug Overbrook, aided on the starboard side by the steam tug Brinton, with Dredge No. 2, in the Arthur Kill, whereby the dredge and her attendant dumper scow were injured. The accident happened according to the

evidence of the libelant about 6:10 p. m., according to the evidence of the claimant about 6:15 or 6:20 p. m., on August 31st. The dredge had not moved out of her working position, as the work had stopped a few minutes before the collision, but preparations were in progress for transferring the scow on her starboard side to her port side, whereupon the spuds would be raised and the dredge breasted off towards Staten Island. The dredge was in cut No. 1, which was the middle cut of the excavated channel, and was headed westward. The strong flood tide was running from Dooley's Point northerly onto the New Jersey shore, where from the coal docks of the Central Railroad of New Jersey it set up the channel, but with a tendency towards the Staten Island shore. So that, as the tow approached the point of collision, the set of the tide would tend to a degree to throw it upon the scow. The tow kept up in the direction of the coal docks, but there were two boats, lying one outside of the other, abreast of the dock, so that the available space was cut off some 50 feet in that direction, and when the tug got in that neighborhood she was obliged to port her wheel and keep up the Kill. Cut No. 1 is 25 feet to the southward of the middle line of the channel. The dredge was over the cut. From the middle cut to the nearest dock on the New Jersey shore was 475 feet, and this available space was lessened by the width of the scow, which was about 30 feet, and by the width of the boats lying at the dock, which was 50 feet, leaving some 395 feet clear space for the tow to pass. The evidence shows that it would take from 20 minutes to half an hour after work was stopped to get the dredge ready to breast off. The tug General Newton, attending on the dredge, was lying under the stern of Dredge No. 2 and ahead of Dredge No. 7, which was some 75 feet astern and somewhat southerly of Dredge No. 2. One of the boats in the tow, probably in the fifth tier, hit the scow and drove her astern of Dredge No. 2, whereupon a boat in the tow, probably in the sixth tier, was thrown across the dredge, so that her house collided with the bucket, and thereupon went around on the port side of the dredge. The dipper of the dredge had been drawn up somewhat after the work stopped and just before the collision.

There are two questions involved in the case: First, whether the dredge was in such a position that the tow could have been taken by, in the exercise of requisite skill; and, second, whether the scow alongside of the dredge should have been used on the port side, leaving greater room in the channel. The captain of the Overbrook stated that navigable skill could not have taken the tow past the dredge that night, and when asked why, then, he attempted it, he stated that he did not know that the dredge was there until after he had passed the B. & O. Bridge, when it was impossible for him to round on the strong flood tide. The evidence of Capt. Moriarty of the General Newton is that he had not known of boats rounding on the flood tide above the bridge. However, the captain of the Overbrook knew that the dredge was at work in that vicinity, and the question is whether he should not have learned what the situation was before he attempted to pass her. But it seems from the evidence of the master of the Brinton that 300 or 400 feet would have been "pretty good room" to pass, and the evidence tends to show that there was 395 feet clear space. Consider-

able skill was required to take the tow past with the power furnished for it, but even then it seems that the Overbrook had sufficient room.

The claimant insists that the dredge unnecessarily blocked the channel, because she was through work and should have been out of the way. This contention is not supported by the evidence. The claimant also insists that the scow could have been kept on the port side, and thereby left 30 feet more room. By changing the chains on the bucket, the scow could have been worked on the port side; but the starboard side has the advantage, that the scow is something of a guide to indicate the line of excavation. It is a continuance of the range.

The answer does not allege that the starboard position of the scow was a fault, and it is not found to be so. The exact location of the dredge is known, as is the distance therefrom to the dock. Thereby the space usable by the tug and her tow is mathematically ascertained. The evidence shows that it was sufficient. Certainly the dredge was lawfully where she was. Hence the libelant should have a decree.