## THE FRED B. DALZELL, Jr.

## THE H. M. FLAGLER.

(Circuit Court of Appeals, Second Circuit. July 18, 1924.)

Nos. 309–312.

1. **Shipping ⬅️3½, New, vol. 8A Key-No. Series—Court must determine respective liability for collision of steamship owned by United States and tugs operated by Director General of Railroads.**

On libels for collision of steamship owned by United States with tow in charge of tugs operated by Director General of Railroads, court must determine respective liability of steamship and tugs, though liability of either means payment by United States, since under Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), and General Order 50a, different transportation systems must be regarded as separate entities, answerable for their own wrongs.

2. **Collision ⬅️105—Evidence held to show tug was at fault.**

On libel for collision between steamship and tow, evidence *held* to warrant finding collision was due to failure of tug to keep tow straight behind her.

3. **Collision ⬅️95(1)—Tugs must have control of tows to prevent damage to other vessels.**

Tugs which have long tows in tide waters must see to it that they control their tows sufficiently to prevent them from doing damage to other vessels.

4. **Collision ⬅️95(1)—Rule limiting length of hawsers not applicable to barges confined to inland waters.**

Regulations by Secretary of Commerce and Labor, promulgated under Shipping Act May 28, 1908, § 14 (Comp. St. § 7969), limiting length of hawsers between towing vessels and seagoing barges, are not applicable to barges navigating inland waters solely.

5. **Collision ⬅️95(2)—Unnecessary length of hawser between tug and tow held to require tug to exercise high degree of care.**

Tug with barges in tow on 100-fathom hawser, thereby greatly increasing risk of navigating in narrow tide-water channel, is bound to exercise very high degree of care, and was liable for failure to control tow and permitting it to swing across bow of steamship, resulting in collision.

6. **Collision ⬅️105—Tug whose fault is beyond doubt must clearly prove fault of another.**

Where the fault of a tug in permitting her tow to collide with a steamship was established beyond doubt, she was not entitled to divide damages with the steamship, except on clear proof of a fault not committed in extremis.

Appeals from the District Court of the United States for the Southern District of New York.

Libels in admiralty by James McWilliams Blue Line and others against the Standard Oil Company (N. J.) and others, by the East River Transportation Company against the Director General of Railroads and others, by Benjamin B. Marco and another against the steamship H. M. Flagler, claimed by the United States, and others, and by Thomas J. Farrell and another against the Director General of Railroads and others. From decrees against the Director General of Railroads, he appeals. Affirmed.

In the first of the above cases the decree for damages, interest, and costs amounted to $39,831.37. In the second case the decree for damages, interest, and costs amounted to $1,525.70. In the third case the decree for damages, interest, and costs amounted to $2,114.32. In the fourth case the decree for damages, interest, and costs amounted to $1,394.43. These separate decrees total $44,865.82, and each bears interest from its date.

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for Director General of Railroads.

Herbert Green, of New York City, for James McWilliams Blue Line, owner of the barge Blue Gown, and James Fraleigh, master thereof, for James McWilliams Blue Line, owners of scow barges Blue Gown and Blue Ocean, and for owners of barge Tyrone.

Harrington, Bigham & Englar, of New York City, for East River Transp. Co.

Foley & Martin, of New York City, for Thomas F. Farrell, owner of the Temple No. 88.

Courtland Palmer, of New York City (Robert S. Erskine, of New York City, of counsel), for Standard Oil Co., of New York and Standard Transp. Co.

Burlingham, Veeder, Master & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for claimant of steam tug Fred B. Dalzell, Jr.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, for Standard Oil Co. of New Jersey.

William Hayward, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. in Admiralty, of New York City, of counsel), for the United States.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. These suits are brought in admiralty to recover damages arising from a collision which occurred on August 8, 1918, at about 10:30 a. m.; the weather was clear, the wind light, and the tide was ebb. The collision occurred soon after the steamship H. M. Flagler rounded St. George, Staten Island, N. Y., and entered the Kill von Kull. The vessel had left Stapleton, Staten Island, and was bound for Bayonne, N. J. The Flagler was about 477 feet long, and her draft was 27 or 28 feet, and her tonnage was about 9,000 tons gross. She had on board a cargo of crude oil, and was accompanied by the steam tug Fred B. Dalzell, Jr., which was on her starboard bow with a line to her. The master of the Dalzell was upon the bridge of the Flagler and at all times was in control of her navigation.

The channel in the Kill for vessels of the draft of that of the Flagler is narrow, being only about 150 feet to 175 feet in width at high water, and the Flagler by reason of her draft was unable to go upon her starboard or Jersey side of the channel, but was compelled to navigate in midchannel. The tug Bern, with a fleet of about 11 coal boats in tow, was coming up the Kill, and was also in about mid-channel. She was bound to New York from Port Reading, and was being operated by the Director General. The Bern had her tow on a hawser of about 100 fathoms in length.

While there is some difference in the testimony as to the number of boats in the tow, yet the testimony generally shows that they were made up on four tiers. There were no other boats in the vicinity to interfere with the movements of the vessels. It would not have been safe for the Flagler, drawing between 27 and 28 feet, to have attempted to pass the Bern and her tow port to port, as this would have forced the Flagler too far over to the Constable Hook side of the channel, where the water was shoal. Accordingly, when the vessels were about a half mile apart, the Flagler blew the Bern a two-blast signal. The Bern immediately answered with two blasts, and the Flagler starboarded and passed the Bern starboard to starboard clearing by a safe distance.

The Bern starboarded her helm and hauled over farther toward the New Jersey shore, changing her course 6 to 8 points to port, but the tide caught the tail of her tow and swung it across the course of the Flagler. The Flagler at once blew alarms, stopped, and reversed her engines, and sounded three blasts. The Fred B. Dalzell, Jr., under orders from the Flagler's bridge, went full speed ahead in order to swing the Flagler's bow to port

and counteract the effect of the Flagler's reversed engines. The tug Ashley let go, backed under the tail of the tow and came up on the starboard side. With her stem against the stern of the boat Temple 88, the starboard boat in the third tier, she attempted to push the tow over toward New Jersey.

The tow continued to swing across the Flagler's bow, and the steamer's way was about stopped when the barge Blue Gown, the starboard barge in the head tier of the tow, swung down with the tide against the Flagler's bow. This contact broke up the tow and damaged the Blue Gown and some of the other boats.

The United States of America was the owner of the steamship Flagler at the time of the collision, and the vessel was operating under charter to the Standard Oil Company of New Jersey. The Director General of Railroads was made a party on the ground that he was operating the tugs Bern and Ashley. The Standard Oil Company of New Jersey was made a party on the ground that it was operating the steamship Flagler. The tug Fred B. Dalzell was made a party on the ground that it was assisting in, and her master was in charge of, the navigation of the Flagler.

The main question considered in the court below was whether the Flagler went as far to port as she should have done after initiating the two whistle signals, and whether the Bern took, or had the means of taking, proper steps to avoid collision. The District Judge exonerated the Flagler because in his opinion, in view of her draft and the width of the channel, she went as far to port as she safely could. He found the Bern at fault for being unable to keep her tow under control, first, because her tow was unwieldly, and, second, because she did not have sufficient helping tugs to keep the tow straight, and he declared that, even if the Flagler did keep her course, there was evidently plently of room to pass, if the Bern had been able to control its tow.

The appellant is in this court, however, contending that the Flagler was solely at fault in not stopping, and for heedlessly and unnecessarily going into collision with the tow of the Bern. No claim is made by the appellant that any liability exists for the collision, except on the part of the Flagler. The appellant conceded at the argument that the tug Dalzell was not at fault, and no claim was made of liability on the part of the Standard Oil Company of New Jersey or the Standard Transportation Company.

[1] The sole appellant here is the Director General of Railroads. In the argument in this court the Director General, through his counsel, claims that the entire responsibility for the collision rests upon the Flagler, which is owned by the United States of America. At the time this collision took place the Director General of Railroads was operating the tugs Bern and Ashley as part of one of the railroad systems under federal control. If the appellant should succeed in this appeal as against the Flagler, which is the prayer of his brief, it is argued that the result would mean nothing, for liability of the Flagler or liability of the Director General of Railroads means payment by the United States. Since this case was argued in this court the Supreme Court has decided James C. Davis, Director General of Railroads (as Agent), v. Timothy Donovan, 265 U. S. 257, 44 Sup. Ct. 513, 68 L. Ed. 1008. In that case that court has again had occasion to construe section 10 of the Federal Control Act, approved March 21, 1918, c. 25, 40 Stat. 451, 456 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), together with General Order 50a. Section 10 of the Federal Control Act provides that carriers under federal control shall be subject to liability as common carriers under state and federal laws, and that in actions against them no defense shall be made upon the ground that the carrier is an instrumentality of the federal government.

General Order 50a directs that actions at law, suits in equity, or proceedings in admiralty growing out of operation of any system of transportation, which might have been brought against the carrier, but for federal control, shall be brought against the Director General, and not otherwise; that service of process may be made upon officials operating a railroad for the Director General, as formerly permitted in actions against the road; and further the pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom.

In the Donovan Case a libel was filed against the Director General of Railroads of the United States (New York, New Haven & Hartford Railroad Company), for whom

James C. Davis, Agent, etc., had been substituted, and in which the libelant sought to recover damages sustained by his vessel when in collision with the New York, New Haven & Hartford Railroad Company's car float No. 46. It appeared that the vessel while moored at a pier had suffered damage by contact with car float No. 46 negligently cast loose by a New York Central Railroad tug. At the time the Director General was operating both railroads and the tug. It was contended that, as the New York Central tug was under the control of the Director General of Railroads operating the New York Central Railroad; the Director General of Railroads operating the New Haven Railroad being a separate and distinct person was in no way responsible.

In this court the argument prevailed that it was not necessary in such a suit to join as a defendant the company in the operation of whose road the liability arose, but that recovery was authorized on proof that it arose in the operation by the Director General of any road or system. But in the Supreme Court a different view prevailed and it was said: "Every system was operated as an entity; its agents and employees knew and carried on its ordinary affairs, but not those of other carriers. The Director General necessarily relied upon the organization of each system, and could demand notice sufficient to set the proper one in motion; otherwise, proper defenses might not be presented." And in Missouri Pacific Railroad Co. v. Ault, 256 U. S. 554, 560, 41 Sup. Ct. 593, 596 (65 L. Ed. 1087), the court pointed out that, while the transportation systems were controlled and administered by the United States, they were treated as separate entities, "regarded much as ships are regarded in admiralty," and "dealt with as active responsibility parties answerable for their own wrongs."

In view of the decisions of the Supreme Court in the Donovan and Ault Cases, we are of the opinion that the instant case must be decided without regard to the decision in Globe & Rutgers Fire Insurance Co. v. Hines, Agent (C. C. A.) 273 Fed. 774, which is to be distinguished therefrom. We shall therefore regard the different transportation systems as separate entities, to be dealt with as active, responsible parties answerable for their own wrongs.

[2] This makes it necessary to inquire whether the Flagler was at fault. The master of the Bern admitted that the proposal of the Flagler to pass starboard to starboard was proper. He testified:

"Q. Was there any doubt in your mind, when you heard two from the Flagler, that that was a proper maneuver? A. Yes, sir.

"Q. There was some doubt in your mind? A. Oh, no; there was no doubt in my mind.

"Q. You have no complaint to make against the Flagler for blowing two blasts? A. No, sir.

"Q. You thought at that time that it was all right to pass that way? A. Yes, sir."

There was plenty of room to pass starboard to starboard, even if the Flagler had kept her course, and if the Bern had controlled its tow. But the tide caught the tail of the Bern's tow and swung it across the Flagler's bow. There is no doubt that the collision was due to the failure of the Bern to keep her tow straight behind her. Instead, she permitted it to swing across the Kills to the Staten Island side of the channel.

[3] The case is governed by the rule laid down in The Wyomissing, 232 Fed. 448, 146 C. C. A. 442. In that case we said: "Tugs which have long tows in tidewaters must see to it that they control their tows sufficiently to prevent them from doing harm to other vessels. We think the Wyomissing solely at fault."

And in The Aurora, 258 Fed. 439, 169 C. C. A. 455, we said: "The fault may well be predicated upon the Aurora alone, with such a long tow in tidewaters in an uncontrollable state. She was obliged to keep her tow in line, and if she had not sufficient power to do this alone, it was incumbent upon her to employ helpers. The Busby went as close to the Staten Island shore as safety would permit, and we are of the opinion that she should be exonerated from fault."

There are numerous cases in which the obligation to provide sufficient assisting tugs in such cases has been enforced: The R. G. Townsend (C. C. A.) 278 Fed. 726, 728; The Charles B. Sanford, 204 Fed. 77, 122 C. C. A. 391; The Prinz August Wilhelm (D. C.) 166 Fed. 995; Thames Towboat Co. v. Pennsylvania R. Co. (D. C.) 157 Fed. 305, 307; The Overbrook (D. C.) 149 Fed. 785; The Genessee, 138 Fed. 549, 70 C. C. A. 673; The S. S. Wyckoff (D. C.) 138 Fed. 418; The E. T. Williams (D. C.) 126 Fed. 871; The Helen R. Cooper, Fed. Cas. No. 6333, affirmed 14 Wall. 204, 20 L. Ed. 881; The George Farrell, Fed. Cas. No. 5332.

[4] The court in his opinion refers to the fact that in this case "the 75-fathom hawser rule was violated." Shipping Act May 28, 1908, § 14 (35 Stat. 428 [Comp. St. § 7969]), gave authority to the Secretary of Commerce

and Labor to issue regulations limiting the length of hawsers between towing vessels and sea going barges and the length of such tows, in any of the inland waters of the United States. In pursuance of the authority thus conferred the Secretary of Commerce and Labor promulgated the following regulation effective on or after February 1, 1909:

"Tows of seagoing barges navigating the inland waters of the United States are limited in length to four vessels, including the towing vessel or vessels. Hawsers are limited in length to 75 fathoms, measured from the stern of one vessel to the bow of the following vessel, and should in all cases be as much shorter as the water or sea will permit."

This regulation applied, it will be observed, only to seagoing barges navigating the inland waters of the United States; and the barges in this case were not seagoing barges, their navigation being solely confined to the inland waters, as defined by the regulations issued by the Secretary of the Treasury in pursuance of the Act of February 19, 1895, § 2 (Comp. St. § 7972). Moreover the 75-fathom rule was not in force at the time this accident happened, having been suspended by the Secretary of Commerce and Labor June 4, 1917, when the rules were "suspended for the duration of the war or until further notice," and as this collision occurred on August 8, 1918, the rule had already been suspended for more than a year when it happened.

In The H. M. Whitney, 86 Fed. 697, 30 C. C. A. 343, the hawser was one of some 70 or 80 fathoms. In that case, this court, speaking through Judge Lacombe, said: "In view of the testimony, we are not prepared to say that the towing hawsers used by this flotilla were too long, nor that it is improper navigation to tow the barges 'tandem,' or to tow more than one at a time. That there cannot, even under the most favorable circumstances, be the same control exercised over such a flotilla as over a vessel moving under her own power, is self-evident. So, too, is the proposition that, the longer a vessel or a flotilla is, the more space she will require to maneuver in. Still, it is not for the courts to forbid the use of public waterways by long tows, however great a menace they may be to navigation, when the authorities whose function it is to regulate navigation in such waterways allow them. We had the question of towing on a long hawser through Hell Gate before us in The Josephine B., 7 C. C. A. 498, 58 Fed. 813, and held that, in the absence of any special regu-

lations on the subject, the practice, which was shown to be a common one, was not to be condemned on the evidence there adduced. The Circuit Court of Appeals in the First Circuit had the question of a single tow on a long hawser, and used this language: 'It is beyond the province of the courts to condemn a practice so notorious and so long-continued that it must be presumed to be known to congress and to the supervising inspectors, and yet has not been condemned by either of them.' The Berkshire, 21 C. C. A. 169, 74 Fed. 906. But there is a wide difference between condemning such a practice altogether and holding those who indulge in it to a degree of care commensurate with the increased risk which their indulgence in such practice entails. 'While,' as said in The Berkshire, 'we cannot condemn a tow of the charter of that in this case as absolutely unlawful, yet we must hold tugs which navigate this coast with such long and essentially hazardous fleets to the use of the extremest care in the interests of common safety.' The Gladiator, 25 C. C. A. 32, 79 Fed. 446."

[5] We adhere to what was said in the above case, and hold that a tug which undertakes to navigate the Kill von Kull with a tow using a hawser as long as that here employed, thereby greatly increasing the risk which such a practice involves, is bound to exercise a very high degree of care. See The Camden (D. C.) 283 Fed. 326; Western Assurance Co. v. Atlantic Transport Co. (C. C. A.) 277 Fed. 1022; The Aurora, 258 Fed. 439, 169 C. C. A. 455; The Madison, 250 Fed. 850, 163 C. C. A. 164; The Plymouth, 186 Fed. 105, 108 C. C. A. 217; The Pencoyd (D. C.) 157 Fed. 134; The Thames Towboat Co. v. Pennsylvania R. Co. (D. C.) 157 Fed. 305; The Gladiator, 79 Fed. 445, 446, 25 C. C. A. 32.

We hold the Bern liable, therefore, not because of the length of the hawser, but because, using a hawser the length she employed, she failed to control her tow and to keep it in line in tidewaters, and permitted it to swing across the Flagler's bow. If the Bern had controlled her tow, this collision would never have happened.

We are satisfied that the Flagler was not improperly navigated, but did all that she reasonably could be expected to do to avoid the collision, having in mind the restrictions imposed on her by her size and draft. This case should be decided in accordance with the rule applied in The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 216 (37 L. Ed. 84). The court there said: "Where

fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

[6] This rule has been adhered to in numerous cases since decided. The Victory, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519; The Umbria, 166 U. S. 404, 409, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Providence (D. C.) 282 Fed. 658, 663; The Stifinder (C. C. A.) 275 Fed. 271; The Stimson (D. C.) 257 Fed. 762; The Persian, 224 Fed. 441, 442, 140 C. C. A. 135; The Lake Erie Transportation Co. v. Gilchrist Transportation Co., 142 Fed. 89, 97, 73 C. C. A. 313. The fault of the Bern being established beyond any doubt, she is not entitled to divide damages with the Flagler, except upon clear proof of a fault not made in extremis. The Lexington (C. C. A.) 275 Fed. 279, 284. That clear proof is not contained in the record.

The appellant conceded upon the argument in this court that the tug Dalzell was not at fault, and no claim of liability was made for the collision, except as against the Flagler, and we are satisfied that this collision was not due to the fault of that vessel. We affirm the decree.