**MYSTIC STEAMSHIP CORPORATION, Plaintiff,**

v.

**M/S ANTONIO FERRAZ, her engines, etc. and Navegacao Mercantil S.A., Defendants.**

**Action No. 1.**

**NAVEGACAO MERCANTIL, S.A., Plaintiff,**

v.

**The TUG BETTY MORAN, her engines, tackle, apparel, etc., Midland Enterprises, Inc. and Moran Towing Corporation, Defendants.**

**Action No. 2.**

**Nos. 68 Cir. 3724, 69 Cir. 571.**

United States District Court, S. D. New York.

March 26, 1973.

Burlingham, Underwood & Lord, New York City, for Mystic Steamship Corp., the Tug Betty Moran, and Moran Towing Corp., Robert B. Pohl, New York City, of counsel.

Cichanowicz & Calian, New York City, for M/S Antonio Ferraz and Navegacao Mercantil, S.A., Joseph M. Brush, New York City, of counsel.

## OPINION

BONSAL, District Judge.

These consolidated actions in admiralty [1] were brought as a result of a collision of the Barge EASTERN NO. 2 (the "Barge") and the M/S ANTONIO FERRAZ ("Ferraz") which collision occurred in the early morning of June 11, 1968 at the entrance of Chesapeake Bay off Cape Henry, Virginia. The place of the collision was just outside of the area where Navigation Rules for Inland Waters (33 U.S.C. §§ 151–232) ("Inland Rules") apply. The starboard quarter of the Barge came into collision with the bow of the Ferraz, causing damage to both vessels. The collision took place on a clear morning with visibility of at

1. On September 17, 1968, Mystic Steamship Corp. instituted an action against the Ferraz, her engines, etc. and her owner, Navegacao Mercantil, S. A. ("Navegacao"). On February 14, 1969, Navegacao instituted an action against the Tug Betty Moran, her owner Midland Enterprises, Inc., and the Moran Towing Corp. On September 11, 1970, Navegacao discontinued its action against Midland Enterprises, Inc. By order filed August 12, 1971, the two actions were consolidated.

least 8 miles.[2] The actions were tried in admiralty on November 15 and 20, 1972.

As is to be expected when two ships collide, the stories of the two vessels are in sharp conflict. However, for reasons hereinafter stated, the court finds that the collision was caused by the negligence of both vessels and that, accordingly, the damage will be borne equally by the parties. The Schooner Catherine v. Dickinson, 58 U.S. (17 How.) 170, 177, 5 L.Ed. 233 (1854); Moore-McCormack Lines, Inc. v. SS Portmar, 249 F.Supp. 464 (S.D.N.Y.1966). See Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 603, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963).

### The Collision

At approximately 12:15 a.m. on June 11, 1968, the Tug BETTY MORAN (the "Tug")[3] which was under bareboat charter to and operated by the Moran Towing Corporation ("Moran"), a New York corporation, picked up the Barge from Lamberts Point, Norfolk, Virginia for a voyage to New York City. At the times here involved, the Tug was under the navigation of her mate, James Brogan, and with him on his watch were a deckhand, Mr. John Buban, and an engineer. The deckhand served as the lookout and was stationed in the wheelhouse. The Barge, owned by the Mystic Steamship Corp. ("Mystic"), a Delaware corporation, and certified to sail unmanned, was a converted liberty ship with no propulsion machinery or crew space. She had a length of 444 feet and a beam of 57 feet. For this voyage, she was loaded with a cargo of 13,000 tons of coal and had a draft of 27 feet 7 inches forward and 31 feet and 4 inches aft. The towing means consisted of a chain about 60 feet long which ran from the bow of the

Barge through a bull nose and which was shackled onto a steel wire hawser about 2¼ inches in diameter. The hawser was wound onto a drum on the steering engine at the stern of the Tug.

The Tug and Barge proceeded out of Norfolk around Sewell's Point and down Thimble Shoal Channel at a speed of about 8 knots. When the Tug and Barge got to the end of Thimble Shoal Channel, an area where the Inland Rules apply, the hawser was let out to 1500 feet and the Tug set a course of 105 degrees true. Just before the Tug got abeam of buoy R "2" Horn, it slowly changed its course to starboard to 135 degrees true. When the Tug steadied on this course, Captain Brogan noticed the green starboard running light and the white range lights which were open to the right of a vessel (which later turned out to be the Ferraz) about 5 to 10 degrees off the starboard bow of the Tug, in the vicinity of buoy "2 CB," which distance he estimated to be 7 miles. When he first noticed the Ferraz, he thought that she was on a diversion course from the Tug and that if both vessels continued to hold their respective courses, the ships would pass starboard-to-starboard with approximately ½ to ¾ mile apart.

Meanwhile, the Ferraz,[4] owned and operated by Navegacao Mercantil, S.A. ("Navegacao"), a Brazilian corporation, was proceeding northwest at a speed of about 12½ knots and on a course of 273 degrees true towards Cape Henry, Virginia, where arrangements had been made for the ship to take on a pilot for Baltimore. The navigation of the Ferraz was in charge of her master; with him on the bridge were the first, second, and third mates and a helmsman. There were also two lookouts on the prow of

2. The description of the weather as being clear with visibility of at least 8 miles is supported by the testimony of defendant's witness, Captain Medairy, the pilot who piloted the Ferraz to Baltimore immediately after the collision.

3. The Betty Moran was a tug of 289 gross tons, 136 feet long and 35 feet beam.

She was diesel driven, twin screw, 43,000 horsepower with wheelhouse control.

4. The Ferraz was a vessel of 12,667.90 gross tons, and 553 feet long. On this trip, she was bound from Rio de Janeiro to Baltimore loaded with about 16,000 tons of iron ore.

the ship, and the bosun and a seaman were stationed on the bow. At about 3:45 a.m., in preparing to take on the pilot, the Ferraz changed her course to starboard [5] and put her engines on standby. Between 3:45 and 4:00, the speed of her engines varied between a complete shutdown and slow forward. At about 4:00 a.m., the watch on the Ferraz changed as she navigated to pick up a pilot.

Captain Brogan, of the Tug, testified that when the Ferraz was about ¾ mile away, he observed both her red and green sidelights and that her range lights were in line, indicating that the Ferraz had altered her course to starboard. He flashed his light twice at the Ferraz to indicate a starboard-to-starboard passing and to show that he had a tow. Receiving no reply, he repeated the signal 15 seconds later, but again received no reply. Captain Brogan then gave two blasts from his horn, repeating this again, but still received no reply. Noting that the Ferraz would miss the Tug, Captain Brogan slowed down to let the towing hawser fall to the bottom, and turned his searchlight on the Barge for about 6 to 7 seconds.

The evidence indicates that the Tug was first observed by the Ferraz at about 4:03 a.m., approximately 3 minutes before the collision, and those on the Ferraz observed the Tug crossing the bow of the Ferraz from port to starboard at about 4:04 a.m., approximately 2 minutes before the collision.[6] By their depositions, the crew of the Ferraz testified that they did not see or hear any signals from the Tug, and that they did not signal to the Tug. They also testified that when the Tug was first observed, the engines of the Ferraz were stopped and she was proceeding on her own momentum at not more than 3 knots. About 2 minutes before the collision, the crew of the Ferraz first observed the Barge, and her engines were reversed at half speed. About half a minute later, her engines were stopped, but after another half minute (which was one minute before the collision) her engines were reversed at full speed. The helmsman of the Ferraz was ordered to alter course slightly to starboard approximately one minute before the collision.

The collision occurred at about 4:06 a.m. when the Barge came into contact with the bow of the Ferraz at an angle of about 60 degrees.[7]

### The Tug

Captain Brogan testified that the Barge was less maneuverable with a long hawser than with a short hawser since the Barge would swing out more when

---

5. The course recorder on the Ferraz as tabulated by Mr. Suarez indicates that the new course was 303 degrees true while the deck log indicates that the new course was 306 degrees true. The course recorder of the Ferraz as interpreted by Suarez further indicates that the Ferraz' swing rate to the right continued right up to the time of collision with a decrease in the rate of swing between 3:59 and 4:02 a. m. due to an easing of the rudder.

6. The Ferraz contends that the collision would not have occurred if the Tug had not made a 90 degree turn northward when she was some 300 meters off the bow of the Ferraz, swinging the Barge into the Ferraz. The only supporting evidence is the testimony of Capt. Medairy that at about 5:00 a. m. he observed a tug and tow in an area where the Tug and Barge might have reached had such

a turn been made. According to the chart, the depth at the area indicated by Captain Medairy was too shallow to allow the passage of the Barge, so that Captain Medairy must have observed a different tow. Moreover, the log of the Tug shows that at 4:30 a. m. the Ferraz rounded buoy "2 CB" and set its course for New York at a point well to the east. Finally, as Captain Brogan testified, a 90 degree turn could not have been made under the conditions prevailing. Therefore, the court finds no merit to this contention.

7. At the time of the collision, those on the Tug did not realize that the Barge had been struck. It was only on the following day, as the hawser was being shortened to enter New York harbor that those on the Tug observed that the starboard quarter of the Barge had been damaged.

the Tug turned and that with a long hawser he estimated that it would take four minutes to change the course of the Barge 10 degrees. Therefore, in lengthening the hawser to 1500 feet at the end of Thimble Shoal Channel, the Barge became less maneuverable. As Captain Brogan testified that he had towed barges between Norfolk and New York at least 60 times and perhaps a hundred times, he should have known that his course passed the area off Cape Henry where vessels coming into the Bay picked up pilots for Norfolk or Baltimore. The total length of the towline which was about 1560 feet (1500 ft. hawser plus 60 ft. chain) exceeded the maximum length of 450 feet as provided for in the Inland Rules, which applied to the area at the end of Thimble Shoal Channel. (33 U.S.C. § 152; 33 C.F.R. § 84.10). The total length of the flotilla (Tug and Barge) was about 2160 feet, and such a length made the flotilla more vulnerable to collision in the pilot area.

■ The Tug and Barge proceeded into international waters, and when the Ferraz was about ¾ mile off the starboard bow of the Tug, Captain Brogan testified, he thought that the situation would be a crossing one. Under Rule 19 of the International Rules (33 U.S.C. § 1081) :[8]

> "When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

As the Ferraz was to starboard of the Tug, the Tug was under the duty to keep out of the way of the Ferraz. Because of the long towline, the Tug could not keep the Barge out of the way of the Ferraz, except to slow down to drop the towline.

■ The Tug was at fault in letting out the hawser in inland waters, and this fault was a cause of the collision. Had it not done so, it could have more readily controlled the Barge and avoided the collision. See The Fred B. Dalzell, Jr., 1 F.2d 259, 262 (2d Cir. 1924) where the court stated that tugs which have long tows in tide waters must see to it that they control their tows sufficiently to prevent them from doing harm to other vessels.

■■ The Ferraz contends that the situation was a meeting one under Rule 18 of the International Rules (33 U.S.C. § 1080(a)) and that therefore a port-to-port passage was required. However, this rule only applies when the vessels are meeting head on or nearly so. The evidence does not support the conclusion that a port-to-port passage was required. Indeed the Ferraz was closing on Cape Henry to pick up a pilot.

### The Ferraz

■ The Ferraz was at fault in failing to maintain a proper lookout. See The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899) ; Sun Oil Co. v. S.S. Georgel, 245 F.Supp. 537 (S.D.N.Y. 1965), aff'd, 369 F.2d 406 (2d Cir. 1966). Despite the clear weather prevailing on the morning of the collision, the evidence shows that the Ferraz did not observe the Tug until 3 minutes before the collision, and the Barge until 2 minutes before the collision. The Ferraz gave no signals and apparently heard or saw none from the Tug. It is likely that the failure of the Ferraz to observe the Tug and Barge sooner was due to the confusion resulting from the change of the watch on the Ferraz at 4:00 a.m. and the preoccupation of its crew in locating the pilot boat. As stated by Mr. Justice Brown in The New York, *supra*, 175 U. S. at 204, 20 S.Ct. at 73.

> "Her officers failed conspicuously to see what they ought to have seen or to hear what they ought to have heard. This, unexplained, is conclusive evidence of a defective lookout."

See also Sun Oil Co. v. S.S. Georgel, *supra*.

---

8. Rule 19 of the Inland Rules (33 U.S.C. § 204) is the same.

**510**

The failure to maintain a proper lookout imposed upon the Ferraz the burden of establishing that its failure did not and could not have contributed to the collision. Rice v. United States, 168 F.2d 219, 220 (2d Cir. 1948); Gulf Oil Corp. v. The Socony No. 16, 162 F.2d 869, 870 (2d Cir. 1947). The Ferraz did not sustain this burden and no credible evidence was offered by the Ferraz to explain why she did not observe the Tug sooner, or hear her signals.

The evidence also shows that the Ferraz was at fault for failing to reverse her engines sooner. Her engine log shows that 2 minutes prior to the collision the engines were put in reverse at half speed and that they were not put in reverse at full speed till one minute prior to the collision. As the engines were stopped and the Ferraz was practically dead in the water, had the engines been reversed sooner at full speed, the collision could have been avoided.

The Ferraz was also at fault for altering her course to starboard to cross that of the Tug and Barge. See Woodruff v. Pitney, 47 F.Supp. 797 (E.D.N.Y.1942), aff'd, 136 F.2d 684 (2d Cir. 1943). Her course recorder indicates that the Ferraz was swinging to the right prior to the collision and continued to do so after the impact.

### Conclusion

For the reasons above stated, the court finds that both the Tug and the Ferraz were at fault, and therefore that the damage to the Barge and the Ferraz must be borne equally by the parties. The issue of damages is reserved for a subsequent hearing.

The foregoing constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

Settle interlocutory judgments on notice.