**MYSTIC STEAMSHIP CORPORATION,**
**Plaintiff-Cross-Appellee,**

v.

**M/S ANTONIO FERRAZ, her engines, etc., and Navegacao Mercantil S.A., Defendants-Cross-Appellants.**

**NAVEGACAO MERCANTIL S.A., Plaintiff-Appellee and Cross-Appellant,**

v.

**The TUG BETTY MORAN, her engines, tackle apparel, etc., and Moran Towing Corporation, Defendants-Appellants and Cross-Appellees.**

Nos. 765, 852, Dockets 73–2350, 74–1145.

United States Court of Appeals,
Second Circuit.

Argued April 1, 1974.

Decided June 5, 1974.

15 L.Ed. 223 (1855). *See* Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 603, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963).[1]

Robert B. Pohl, New York City (Burlingham Underwood & Lord, New York City, of counsel), for appellants-cross-appellees The Betty Moran and Moran Towing Corp. and plaintiff-cross-appellee Mystic Steamship Corp.

Joseph M. Brush, New York City (Cichanowicz & Callan, New York City, of counsel), for appellee-cross-appellants M/S Antonio Ferraz and Navegacao Mercantil S. A.

Before HAYS and OAKES, Circuit Judges, and CHRISTENSEN, District Judge.*

OAKES, Circuit Judge:

These are appeals and cross appeals by the owners of the tug Betty Moran and the M/S Antonio Ferraz ("Ferraz") from an interlocutory decree (settling all issues save for the question of damages) of the district court holding both responsible for a collision between the Ferraz and the barge Eastern No. 2, owned by Mystic Steamship Corp. The collision occurred in the early morning of June 11, 1968, off Cape Henry, Virginia, at the entrance to Chesapeake Bay. The place of collision was outside the area where the Navigation Rules for Inland Waters, 33 U.S.C. §§ 151–232, apply. The bow of the Ferraz and the starboard quarter of the barge were in collision, causing damage to both vessels. Because the court below found the collision caused by the negligence of both the tug and the Ferraz, the decree was that the damage be borne equally by the offending parties. The Schooner Catharine v. Dickinson, 58 U.S. (17 How.) 170, 177,

The tug Betty Moran, which was under bareboat charter to and operated by the Moran Towing Corp., was a tug of 289 gross tons, 136 feet long and 35 feet beam, driven by a 43,000 h.p. diesel engine with twin screw and wheel house control. The barge under tow, which was sailing unmanned, was a converted Liberty Ship with no propulsion machinery or crew space, having a length of 444 feet and a beam of 57 feet; she was carrying a cargo of 13,000 tons of coal and had a draft of 27 feet 7 inches forward and 31 feet 4 inches aft. The tow consisted of a chain some 60 feet long running from the bow of the barge through a bull-nose shackled onto a steel wire hawser about 2¼ inches in diameter, which in turn was wound onto a drum on the steering engine at the stern of the tug. It is of some significance that, at the time of the collision, the hawser was out 1,500 feet so that the total length of the tow line was 1,560 feet and of the flotilla about 2,140 feet. The tow in question was one from Lamberts Point, Norfolk, Virginia, to New York City, and the collision occurred when the tug was under the navigation of her mate, Captain James Brogan, with a deckhand and an engineer on watch.

The Ferraz was a vessel of 12,667.90 gross tons, some 553 feet long, bound from Rio de Janeiro to Baltimore loaded with about 16,000 tons of iron ore. The Ferraz was headed toward Cape Henry, Virginia, where she was to take on a pilot for Baltimore, and she was at the time of the collision in the charge of her master, with the first, second and third mates and a helmsman on the bridge, two look-

---

* Of the District of Utah, sitting by designation.

1. In Union Oil Co. v. The San Jacinto, 409 U.S. 140, 141, 93 S.Ct. 368, 370, 34 L.Ed.2d 365 (1972), the Supreme Court had granted certiorari "to consider petitioner's request that we abandon the divided-damages rule." The Court did not reach that issue, however, because it found single liability. The obvious inequities of the "procrustean" divided-damages rule have been subjected to abundant criticism, *see* G. Gilmore & C. Black, The Law of Admiralty 438–42 & cases cited therein (1957), but the parties here did not raise this issue below, nor do we reach it, given our disposition of the liability issue.

outs on the prow, and a boatswain's mate and seaman stationed at the bow. The collision occurred at or about 4:06 a. m. when the barge came into contact with the bow of the Ferraz, at an angle of about 60 degrees. It rather ridiculously took place early on a clear morning when there was visibility of at least eight miles. Versions of how the collision occurred, needless to say, differ.

 On the tug's story, the tug and barge proceeded out of Norfolk down the Bay around Sewell's Point and down Thimble Shoal Channel at a speed of about eight knots. When the tug and barge came to the end of the channel, just outside of which the Inland Rules no longer applied, the hawser was let out to 1,500 feet and the tug set a course of 105 degrees true. Just before the tug came abeam of buoy R "2" Horn, it changed course to starboard to 135 degrees true. At that point Captain Brogan said he noticed the green starboard running light and white range lights open to the right of a ship, later identified as the Ferraz, about 5 to 10 degrees off the starboard bow of the tug in the vicinity of buoy R "2CB," a distance he estimated to be seven miles. When Captain Brogan first noticed the Ferraz, he thought the vessels were on diversion courses and that if both held to the line, they would pass starboard to starboard at least a half-mile apart. He testified that, when the Ferraz was about three-quarters of a mile away, he observed both red and green sidelights and that her range lights were in line, indicating that the Ferraz had altered her course to starboard. He flashed his light twice to indicate a starboard-to-starboard passing and to inform the Ferraz that he had a tow. Obtaining no reply, he said he repeated the signal 15 seconds later, but again received no reply, and gave two blasts from his horn. He repeated this

again, but still received no reply.[2] He concluded that the Ferraz would miss the tug, but was concerned about the barge and therefore slowed down to let the towing hawser fall to the bottom. He then turned his search light on the barge for about six to seven seconds. Interestingly, those on the tug did not realize that the barge was struck by the Ferraz until the following day, when the hawser was shortened to enter New York Harbor, at which time it was observed that the starboard quarter of the barge had been damaged.

According to the Ferraz—and her contemporaneous chart is in evidence—at about 2:58 a. m., while on a course headed directly northwest toward the Chesapeake Bay sea buoy, she altered her course to the west 273 degrees and at 3:12 a. m. passed directly south of the sea buoy. Maintaining this course at 3:41 a. m., according to her own chart and the testimony of her witnesses, she passed 1,300 to 1,400 yards *north* of buoy R "2CB," as opposed to the passing south which Captain Brogan thought he had seen when the Betty Moran first sighted the Ferraz. In any event, the Ferraz continued on her course of 273 degrees until 3:45 a. m., at which time she altered her course about 30 degrees to starboard in a northwesterly direction directly toward the pilotage area of Cape Henry. In this area a pilot boat carrying the Ferraz' pilot was cruising in the vicinity of buoy "R2," several miles north-northeast of Cape Henry Light. When the Ferraz made her course alteration to starboard, her engines were put on standby and her engine speed varied between complete shutdown and slow forward. At about 3:50 a. m. her engine speed was reduced to half ahead and then to slow ahead, and at 3:58 a. m. her engines were stopped. Significantly, the tug was not observed by the Ferraz until

2. This signal, under the International Rules, 33 U.S.C. § 1090(a), should, if heard by the Ferraz, have indicated the tug's intention to turn to port. The fact that the Ferraz neither heard nor acted upon the signal, coupled with the fact that the tug itself evidently did not turn to port, is sufficient to prove that the signal in no way contributed to the collision. *Cf.* Oriental Trading & Transport Co. v. Gulf Oil Corp., 173 F.2d 108 (2d Cir.), cert. denied, 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728 (1949).

4:03 a. m., approximately three minutes before the collision. Those on the Ferraz claimed the tug crossed the bow of the Ferraz from port to starboard at about 4:04 a. m. The Ferraz crew claimed that the tug made a 90 degree turn northward some 300 meters off the bow of the Ferraz.[3]

■ There is every reason for supporting the district judge fully in his finding that the Ferraz was at fault in three respects—failing to maintain a proper lookout, failing to reverse her engines sooner, and altering her course to starboard to cross that of the tug and barge. It is quite plain the Ferraz did fail to see the tug "flotilla"—despite an eight-mile range of vision—until three minutes before the collision. The Ferraz gave no signals and apparently heard or saw none from the tug. The inattention may have resulted from a change of watch at 3:45 a. m. which, however, is not clearly disclosed in the chartroom records in evidence. In any event, as the district court said, doubtless the crew was preoccupied in locating the pilot boat. As stated by Mr. Justice Brown in The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 73, 44 L.Ed. 126 (1899), "Her officers failed conspicuously to see what they ought to have seen or to hear what they ought to have heard. This, unexplained, is conclusive evidence of a defective lookout." *See also* Rice v. United States, 168 F.2d 219, 220 (2d Cir. 1948); Gulf Oil Corp. v. The Socony No. 16, 162 F.2d 869, 870 (2d Cir. 1947).

Had the Ferraz reversed her engines sooner, rather than approximately two minutes prior to the collision—when they were put in reverse at half speed—or one minute prior when they were put in reverse at full speed, the collision could easily have been avoided. Doubtless this failure to maneuver was in turn precipitated by the defective lookout.

Quite clearly the Ferraz did alter her course to starboard to cross that of the tug and barge. According to her own gyro course recorder readings, having proceeded for several minutes on a 303 true degree course, at 0356 she began a starboard turn. This took her at

0357 to 310°,
0358 to 320°,
0359 to 328°,
0400 to 333°,
0401 to 340°,
0402 to 347°,
0403 to 360°,
0404 to 14°,
0405.7 to 27°,
0406.1 to 40°,
0406.5 to 50°.

She finally leveled out at 0407 at around 60°, swinging back slightly thereafter. Whether this was proper action under the International Rules in effect in the waters of the collision will be discussed below in connection with our discussion of the action of the tug, Betty Moran.

The court below also found the tug at fault on two grounds, first, because in lengthening the hawser to 1,500 feet at the end of Thimble Shoal Channel the barge became less maneuverable and more vulnerable to collision in the pilotage area off Cape Henry and, second, by virtue of a breach of the tug's duty, in a crossing situation governed by Rule 19 of the International Rules, 33 U.S.C. §

---

3. Captain Medairy, the pilot, testified that at about 5:00 a. m. he observed a tug and tow in an area the tug and barge might have reached had such a turn been made. The district court found, however, that—according to the chart—the depth at the area where he made this observation was so shallow that it would not have allowed the passage of the barge, drawing as it did 31 feet 4 inches aft, so that Medairy must have observed a different tow. This con-clusion is substantiated by the log of the tug, which shows that at 4:30 a. m. the Betty Moran rounded buoy R "2CB"—the buoy by which the Ferraz passed north or south depending on each party's version of the facts. Moreover, Captain Brogan testified that he could not have made any such 90 degree turn, limited in maneuverability as he was with the barge in tow.

1081,[4] to keep out of the way of the Ferraz because the Ferraz was to starboard of the tug. Judge Bonsal's conclusion that the length of the tow line prevented the tug from keeping the barge out of the way of the Ferraz and was thus a contributing cause of the collision was in reliance on The Fred B. Dalzell, Jr., 1 F.2d 259, 262 (2d Cir. 1924).

The charts make it clear, however, that the collision occurred outside the line for use of the Inland Rules, although in a "restricted area" where anchoring, trawling, fishing and dragging are prohibited. The distance from the point of collision beyond Inland Rules waters was about two miles and the mouth of Thimble Shoal Channel is about four miles within Inland Rules waters. It was at the end of the channel and, the trial judge held, within Inland Rules waters that Captain Brogan had lengthened his tow line. Had the collision occurred in these waters the tug would have been subject to those Rules which require, with an exception mentioned below, a maximum length of 450 feet for a tow. 33 U.S.C. § 152, 33 C.F.R. § 84.10. A barge is, however, plainly less maneuverable with a long hawser than a short one; indeed here Captain Brogan estimated that it would take four minutes to change the course of his barge 10 degrees. Perhaps the thrust of the district court's finding of fault is that the tow was still unduly long because Captain Brogan had made this run 60 to 100 times and "should have known that his course passed the area off Cape Henry where vessels coming into the bay picked up pilots for Norfolk or Baltimore."

■ The chart indicates, however, that the pilotage area is some four miles from the collision point, pilots being normally embarked in the vicinity of "R2" buoy. There was ample sea room for the Ferraz to navigate. Moreover,

there is no International Rule limiting the length of tow, and the collision here was not subject to the Inland Rules. The case relied upon by the district court, *The Fred B. Dalzell, Jr.*, is distinguishable because there a fleet of 11 barges being towed through the Kill von Kull on a long hawser was caught by the tide and swung across the channel into the path of an approaching vessel. The tug was held liable "not because of the length of the hawser, but because, using a hawser the length she employed, she failed to control her tow and to keep it in line in tidewaters, and permitted it to swing across the Flagler's bow." 1 F.2d at 263. In our case, the Betty Moran did control her tow, which was at all times directly behind the tug. The barge did not swing into the Ferraz, the Ferraz turned into the barge. *See* The Scow No. 27, 164 F.2d 778 (4th Cir. 1947); The Hamilton, 212 F. 1016 (E.D.Va.1914). The district court we think erroneously extended the line for observance of the Inland Rule towing regulations[5] two miles into international waters. If Captain Brogan were at fault for extending his tow at the end of Thimble Shoal Channel, that fault was rendered legally irrelevant by the tow's reaching international waters. If there were decreased maneuverability as a result of the longer tow, that decreased maneuverability on the part of the tug was hardly a contributing cause of collision when the Ferraz did not see the tow until three minutes before the collision and was in process of making approximately a 90 degree turn to starboard in order to collide with the barge.

As we have said, the Ferraz cannot claim that the Betty Moran made a 90 degree turn to port to effectuate the collision. Indeed, it well appears that these vessels were meeting—as the district court in effect found by indicating that the Ferraz should not have altered her

---

4. § 1081. Power-driven vessels crossing (Rule 19)

When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.

5. Even the Inland Rules allow the master of the towing vessel some discretion, 33 C.F.R. § 84.10, *following* 33 U.S.C. § 152.

course to starboard. In fact, the Ferraz was proceeding on a 303 degrees true reading ten minutes before the collision, and the Betty Moran's evidence was that she was heading out on a course of 135 degrees true. This is quite consistent with the place of the mouth of Thimble Shoal Channel and the point of collision delineated by the Ferraz in her contemporaneous chart. The meeting rule set out in material part in the margin [6] clearly requires vessels approaching starboard to starboard to hold course until they pass clear on their starboard sides.

According to the Betty Moran, the Ferraz bore on the Betty Moran's starboard bow and was showing a green light with her range lights open to the right; the Ferraz and barge clearly would have passed had the Ferraz held her course instead of making her quite sharp turn to starboard. As J. Griffin, The American Law of Collision § 32, at 75–76 (footnote omitted) (1949), notes:

> Article 18 of the International Rules [33 U.S.C. § 1080(a)] has no express provision for any case except that of steam vessels meeting end on or nearly so, so as to involve risk of collision. It says nothing about vessels approaching green to green, or each on the other's starboard,—evidently for the reason that, since they are not end on or nearly so, there is no risk of collision. . . . They have merely to hold their courses. . . . [t]he obligation to pass starboard to starboard arises from the relative positions of the vessels. . . .

The Ferraz argues, however, that when at 3:45 a. m. the Ferraz did change her course from 273 degrees to 303 degrees, the Ferraz was not frozen into a meeting and starboard-to-starboard situation, but rather it should have been plain to the Moran that the Ferraz was headed for the pilotage area and the vessels were on a port-to-port meeting. What may have appeared to the Ferraz to be the Moran's turning and passing by the bow, however, was really the Ferraz's turning to starboard, as her gyro course recorder indicated. This is not a case like The Steel Inventor, 43 F.2d 958, 960 (2d Cir. 1930), where a course change two miles and five minutes away from the collision was held too remote to fault The Inventor, since there was opportunity for The Woolsey to comply with her duty under the starboard hand rule as the burdened vessel. Both of the vessels in our case were proceeding quite slowly, presenting a meeting situation, not a crossing one, even though the Ferraz would like to have it otherwise. See The Arfeld, 42 F.2d 745, 748 (E.D.La.1930); The S.S. Bylayl, 49 F.Supp. 439, 442–443 (S.D.N.Y.), aff'd on opinion below, 139 F.2d 348 (2d Cir. 1943). Had this been a port-to-port meeting, while the rule is that the vessels should hold their course, see Puratich v. United States, 126 F.2d 914 (9th Cir. 1942), the Ferraz' turn to starboard would have taken her out of collision's path. It is true that the application of the rules of the nautical road cannot be fixed precisely and indeed vary with the relation of courses, the speed of the vessels, the range of visibility, the character of the waters and all of the other infinitely varying conditions at sea. See Mr. Justice Clifford in New York & Liverpool United States Mail Steamship Co. v. Rumball, 62 U.S. (21 How.) 372, 383–385, 16 L.Ed. 144 (1859). Here, however, we had a rather sudden, if accountable alteration of course by the Ferraz, thereby creating a situation of peril where none before existed. To the extent that the district court considered that the crossing rules might have ap-

---

6. When two power-driven vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other. This section only applies to cases where vessels are meeting end on, or nearly end on, in such a manner as to involve risk of collision, and does not apply to two vessels which must, if both keep on their respective course, pass clear of each other. . . . It does not apply . . . where the green light of one vessel is opposed to the green light of the other . . . . .
33 U.S.C. § 1080(a).

**544**

plied to require the Betty Moran to keep out of the way of the Ferraz, then it could not have faulted the Ferraz for turning to starboard. The court may have based its finding of a crossing situation upon an erroneous interpretation of the testimony of Captain Brogan. He had said that when he saw the Ferraz' range lights line up and she opened up both side lights, "it was a meeting situation," but he had changed his course and made it a crossing situation. There then ensued the following:

Q. Crossing in what respect?

A. In the respect that it was too close to do anything to help him get out of—my barge to get out of the way.

Q. How far away were you at that time?

A. I judged a half to three quarters of a mile.

In other words, when Captain Brogan originally said the Ferraz' course "made it a crossing situation" he was not saying that the crossing rules were applicable; rather he was asserting that the vessels were still meeting but the Ferraz had made a change of course to head across the bow of the Betty Moran. At a half to three-quarters of a mile the Ferraz simply could not turn to starboard and require the Betty Moran and her tow to keep out of the way. As Griffin, *supra*, § 22 at 34–35 states: "Obviously, in order to have safety, one must have certainty,—if the rule to be applied kept changing as the vessels approached, there could be no certainty . . . in other words the *character of the situation does not change.*"

In short we hold that the Betty Moran was not at fault in any respect and that the sole cause of the collision was the gross fault of the Antonio Ferraz in failing to keep an adequate lookout, turning to starboard toward the tug and the tow and not timely reversing her engines under the circumstances.

Judgment against Navegacao Mercantil S.A. and M/S Antonio Ferraz affirmed; judgment against the tug Betty Moran, her engines, tackle apparel, etc., and Moran Towing Corporation reversed; tug Moran exonerated.